UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:22-cv-174-MOC

| LORETTA GREENE, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | **ORDER** |
|  | ) |  |
| KILOLO KIJAKAZI, | ) |  |
| Acting Commissioner of | ) |  |
| Social Security, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

**THIS MATTER** is before the Court on the parties' opposing Motions for Summary Judgment. (Doc. Nos. 11, 14). Plaintiff Loretta Greene brought this action, pursuant to 42 U.S.C. § 405(g), for review of Defendant's final decision that Plaintiff was not disabled within the meaning of the Social Security Act ("Act"). Having carefully considered such motions and reviewed the pleadings, the Court enters the following findings, conclusions, and Order.

**FINDINGS AND CONCLUSIONS**

**I.     Administrative History**

Plaintiff claims disability due to fibromyalgia, degenerative disc disease ("DDD"), right knee degenerative joint disease ("DJD"), carpal tunnel syndrome, migraine headaches, and depression and anxiety. (Tr. 1010). She applied for disability insurance benefits in February 2014, with an alleged onset date ("AOD") of July 30, 2009. (Tr. 173–79, 1007). Her date last insured ("DLI") was December 31, 2015. (Tr. 1010). She was under the age of 50 and considered a younger individual at her DLI. (Tr. 1040). Plaintiff has a limited education, having only

-1-

Case 3:22-cv-00174-MOC   Document 16   Filed 01/18/23   Page 1 of 17

completed the tenth grade. (Tr. 1040, 1071). She has past relevant work ("PRW") as a doubling machine operator. (Tr. 1040).

This matter was the subject of a prior remand from this Court. (Tr. 1100–15). The Administrative Law Judge ("ALJ") denied Plaintiff's claim at Step Five of the Sequential Evaluation Process ("SEP"), finding there were jobs existing in significant numbers that she can perform, such as stuffer, lens inserter, and addresser. (Tr. 1041–42). After the Appeals Council denied Plaintiff's exceptions, (Tr. 992–98), she appealed to this Court.

## II. Factual Background

The Court finds that the ALJ's findings of fact are supported by substantial evidence and therefore adopts and incorporates such findings herein as if fully set forth. Such findings are referenced in the substantive discussion which follows.

## III. Standard of Review

The only issues on review are whether the Commissioner applied the correct legal standards and whether the Commissioner's decision is supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 390 (1971); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Review by a federal court is not de novo, Smith v. Schwieker, 795 F.2d 343, 345 (4th Cir. 1986); rather, inquiry is limited to whether there was "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Perales, 402 U.S. at 401 (internal citations omitted). Even if the Court were to find that a preponderance of the evidence weighed against the Commissioner's decision, the Commissioner's decision would have to be affirmed if it was supported by substantial evidence. Hays, 907 F.2d at 1456. The Fourth Circuit has explained substantial evidence review as follows:

> the district court reviews the record to ensure that the ALJ's factual findings are supported by substantial evidence and that its legal findings are free of error. If the

-2-

Case 3:22-cv-00174-MOC   Document 16   Filed 01/18/23   Page 2 of 17

> reviewing court decides that the ALJ's decision is not supported by substantial evidence, it may affirm, modify, or reverse the ALJ's ruling with or without remanding the cause for a rehearing. A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling. The record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence. If the reviewing court has no way of evaluating the basis for the ALJ's decision, then the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.

Radford v. Colvin, 734 F.3d 288, 295 (4th Cir. 2013) (internal citations and quotations omitted).

### IV. Substantial Evidence

#### a. Introduction

The Court has reviewed the transcript of Plaintiff's administrative hearing, the decision of the ALJ, and the relevant exhibits contained in the extensive administrative record. The issue is whether the decision of the ALJ is supported by substantial evidence, not whether the Court might have reached a different conclusion had it been presented with the same testimony and evidentiary materials. For the following reasons, the Court finds that the ALJ's decision was supported by substantial evidence.

#### b. Sequential Evaluation

For the purposes of Title II of the Act, "disability" means "the inability to do any substantial gainful activity [SGA] by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). A five-step process, known as "sequential" review, is used by the Commissioner in determining whether a Social Security claimant is disabled. The Commissioner evaluates a disability claim pursuant to the following five-step analysis:

a. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings;

b. An individual who does not have a "severe impairment" will not be found to be disabled;

c. If an individual is not working and is suffering from a severe impairment that meets the durational requirement and that "meets or equals a listed impairment in Appendix 1" of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors;

d. If, upon determining residual functional capacity, the Commissioner finds that an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made;

e. If an individual's residual functional capacity precludes the performance of past work, other factors including age, education, and past work experience must be considered to determine if other work can be performed.

20 C.F.R. § 416.920(a)–(f). The burden of proof and production during the first four steps of the inquiry rests on the claimant. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995). At the fifth step, the burden shifts to the Commissioner to show that other work exists in the national economy that the claimant can perform. Id.

### c. The Administrative Decision

The ALJ followed the five-step sequential evaluation in the analysis of Plaintiff's alleged disability. See 20 C.F.R. § 416.920(a). Plaintiff challenges only the ALJ's finding at Step Five that there are jobs existing in significant numbers that she can perform, such as stuffer, lens inserter, and addresser. (See Tr. 1041–42).

## V. Discussion

Plaintiff does not dispute that she could perform a range of unskilled work on a sustained basis despite her allegations of disabling memory issues, panic attacks, and other emotional symptoms. (See Tr. 1015–40). Likewise, Plaintiff does not take issue with the ALJ's finding that many of her physical disorders did not render her incapable of a range of sedentary work. (See Tr. 1021–40). Plaintiff instead raises two narrow issues regarding two specific impairments— claiming that the ALJ erred by not giving more credit to her allegations about fibromyalgia and migraines. (See Pl.'s Br. 4). However, the Court finds that substantial evidence supports the ALJ's findings regarding Plaintiff's fibromyalgia and migraines.

**A. Substantial Evidence Supports the ALJ's Determination that Plaintiff's Allegations about Fibromyalgia Could Not Be Fully Credited During the Relevant Period.**

The ALJ cited two specific reasons, each supported by substantial evidence, for why Plaintiff allegations about her fibromyalgia symptoms did not prove that she was incapable of performing a range of sedentary and unskilled work on a sustained basis during the relevant period. Specifically, ALJ cited: (1) relevant inconsistencies in Plaintiff's testimony; and (2) evidence about Plaintiff's activities during the relevant period that belied her allegations. Either of these, on their own, satisfy the substantial evidence standard. Additionally, the Court is unpersuaded by Plaintiff's reliance on Arakas v. Comm'r, Soc. Sec. Admin., 983 F.3d 83, 101 (4th Cir. 2020), because the ALJ here did not engage in the type of analysis that was found flawed in Arakas.

**1. The ALJ Reasonably Found that Inconsistencies in Plaintiff's Testimony Undercut Her Allegations about Fibromyalgia Symptoms.**

The ALJ's primary reason for discounting Plaintiff's allegations about the severity of her symptoms and their limiting effects on her ability to work, including her fibromyalgia allegations, was inconsistencies in her testimony. (See Tr. 1024). For fibromyalgia specifically, at the July 2020 hearing, Plaintiff claimed that fibromyalgia was a problem since 2009 (a year before she even stopped working), and that the disorder made her "skin get[] tender," it was extremely painful to be touched by people, and that she had two or three bad days a week where that pain was "nine and ten." (Tr. 1082–84). However, at the earlier August 2017 hearing, despite being asked by the ALJ if there was "anything else that bothered [her] from 2010 to 2015," (Tr. 1187), and being asked by her own attorney if "there [is] anything else you want to tell the [ALJ] about what was going on with you during that time period that was affecting your ability to work," (Tr. 1192), Plaintiff did not mention the fibromyalgia symptoms that she later described in July 2020, (Tr. 1187, 1192).

In addition, the ALJ also noted contradictory evidence about when and why Plaintiff stopped working. (Tr. 1024). Despite her July 2020 allegation that her fibromyalgia symptoms had been present since 2009, (see Tr. 1082), she had previously testified that she did not stop working until July 2010, (see Tr. 1180), which her earnings records corroborated, (see Tr. 1010 (citing Tr. 1218–19)). As to why she stopped working, she did not describe the fibromyalgia symptoms that she claimed to have in July 2020. Instead, she said that her job was "running her" so she asked to be relocated, but because she was too good at her job, her employer refused. (Tr. 1180). She then only quit after putting in her two-week notice (Id.).

Plaintiff attempts to explain away her inconsistent testimony by stating that she "was not asked about" fibromyalgia in August 2017. (Pl.'s Br. 7). However, she was asked to identify anything that was affecting her ability to work at that hearing twice, including once by her own

-6-

counsel. (See Tr. 1187, 1192). The ALJ's assessment of inconsistencies here was reasonable and grounded in the record. Given this conflicting evidence, the Court will "not second guess the ALJ." Keene v. Berryhill, 732 F. App'x 174, 177 (4th Cir. 2018).

**2. The ALJ Reasonably Concluded that Plaintiff's Activities Conflicted with Her Allegations about Her Fibromyalgia Symptoms.**

In addition to the inconsistencies discussed above, the ALJ also reasonably concluded that the evidence regarding Plaintiff's activities in her "function report, testimonies, and medical evidence show that prior to her date last insured status expiring she was capable of the residual functional capacity delineated below [a range of sedentary and unskilled work] for an eight-hour workday." (See Tr. 1016–17, 1020). As the ALJ noted, Plaintiff's function report from the relevant period suggested that she engaged in significant activities without much difficulty. (See Tr. 1016 (citing Tr. 223–30)).

In terms of household chores, Plaintiff said that she could complete the laundry in an hour, dust in a half an hour, vacuum in 20 minutes, mop in 20 minutes, and sweep in five minutes, and that she did these chores every week "if needed." (Tr. 225). She checked "no" when asked if she needed any help with these chores. (Id.). Otherwise, the only reason she did not do yardwork was because she could not "get plants to grow," without any mention of difficulties with sustained activity. (Tr. 226). She reported cooking four days a week, and that her only difficulty with cooking involved not being able to "stand on my feet that long" (which she would not have to do when performing sedentary work). (Tr. 225). She said that she could shop for groceries in stores for an hour per visit, several times per month. (Tr. 226).

Consistent with that function report, Plaintiff's medical records contained similar statements about her activities during the relevant period. Even when reporting "10/10" pain

-7-

Case 3:22-cv-00174-MOC   Document 16   Filed 01/18/23   Page 7 of 17

when seeking treatment for fibromyalgia in 2015, Plaintiff nevertheless had no "difficulty with bathing, grooming, or any daily activity such as eating or dressing." (Tr. 433; see also Tr. 570, 5732). Although she reported some difficulty with walking or climbing stairs, she had no difficulty "doing errands independently," or "concentrating, remembering, or making decisions." (Id.). In fact, although she lived with her husband, two adult sons, and two daughters-in-law, she nevertheless reported that she did "most of the housework" and "most of the shopping" for her household herself. (Tr. 441). Plaintiff also cared for her husband after he had a quadruple bypass. (Tr. 1020; see Tr. 570). This evidence specifically contradicts Plaintiff's July 2020 allegation that she needed help from her husband due to her fibromyalgia symptoms during the relevant period. (See Tr. 1084).

Further, although the ALJ did not specifically refer to Plaintiff's fibromyalgia allegations in the paragraphs discussing Plaintiff's activities, that discussion is still relevant. As the Supreme Court instructs, a compartmentalized review of an administrative decision is improper because an agency's reasoning need only be "reasonably discernible." Garland v. Ming Dai, 141 S. Ct. 1669, 1679 (2021) (remand is not proper if "the agency's path may reasonably be discerned."). Instead, the ALJ's decision must be read "as a whole." Accord Keene, 732 F. App'x at 177 ("We must read the ALJ's decision as a whole."). When read as a whole, the ALJ's decision shows that the ALJ reasonably found that the contemporaneous evidence about Plaintiff's activities undercut the testimony she gave about her fibromyalgia symptoms five years after her date last insured.

Moreover, the Court agrees with Defendant that Arakas is distinguishable. The ALJ in Arakas erred because the claimant made consistent allegations of disabling fibromyalgia, supported by a twenty-year treatment history showing a progressively worsening condition and

-8-

her rheumatologist's medical opinion, and the ALJ's "chief, if not definitive, reason for discounting [those] complaints" was a "lack of objective medical evidence." 983 F.3d at 97. By contrast, here, the ALJ only noted objective medical evidence when providing a detailed summary of the medical evidence, and the ALJ primarily discounted Plaintiff's allegations about her fibromyalgia because of her inconsistent testimony. (See Tr. 1023–24). And beyond that, the ALJ focused on the contemporaneous evidence concerning Plaintiff's activities. (See Tr. 1020). Relying on those reason was not error under Arakas.

Significantly, Plaintiff does not claim that the ALJ's consideration of her daily activities presents an error like the one found in Arakas. (Pl.'s Br. 5–8). Indeed, unlike "minimal daily activities" reported by the claimant in Arakas, Plaintiff testified here that she did not need any help with significant household chores or grocery shopping, she reported doing most of the chores for her entire household of six adults, and she reported that she cared for her husband when he was recovering from heart surgery. (See Tr. 225–26, 441, 570). That evidence not only fairly supports the ALJ's factual determination about Plaintiff's functional abilities, see Morton v. Kijakazi, No. 1:21-CV-00208, 2022 WL 472187, at *7 (S.D.W. Va. Jan. 24, 2022) (distinguishing Arakas where the claimant engaged in more than minimal activities), but it also directly contradicted Plaintiff's specific allegation that she needed to rely on her husband due to her fibromyalgia symptoms, (see Tr. 1084). See Renee R. v. Kijakazi, No. 4:21-CV-00023, 2022 WL 3446200, at *2 (W.D. Va. Aug. 17, 2022) (finding no error under Arakas where "the record showed that plaintiff's activities were more extensive than she suggested").

Additionally, unlike the claimant in Arakas, Plaintiff's treatment records did not demonstrate that her fibromyalgia symptoms were disabling. Plaintiff saw a rheumatologist, Rinku Bhatia, M.D., and an orthopedist, Tejas Parikh, M.D., for her fibromyalgia complaints.

-9-

Case 3:22-cv-00174-MOC   Document 16   Filed 01/18/23   Page 9 of 17

(See, e.g., Tr. 431–34, 568–72, 711–12, 719–20, 939–40, 5730–33). At her initial visit with Dr. Bhatia in September 2014, although she alleged constant "10/10" pain, it was "partially alleviated" with Lyrica (a medication that Plaintiff was already being prescribed for headaches (see Tr. 335)), and Dr. Bhatia deferred making any further treatment plans. (Tr. 433–34). Plaintiff then visited only Dr. Parikh over the next year, where she tried physical therapy and had diagnostic tests and injections for suspected orthopedic disorders. (Tr. 568–72, 711–12, 719–20, 939–40). Dr. Parikh also added a pain cream and periodically increased Plaintiff's Lyrica dosage, and that medication along with hydrocodone twice a day resulted in meaningful pain relief, as she rated her overall pain as a "4." (See Tr. 719, 939). Dr. Parikh eventually concluded that Plaintiff's pain was not an orthopedic issue, so he recommended follow up with Dr. Bhatia and continued use of pain medications. (Tr. 940).

At the follow-up visit with Dr. Bhatia, Plaintiff said that she currently had "off and on" pain in her extremities. (Tr. 5731). Dr. Bhatia assessed that Plaintiff's presentation suggested either osteoarthritis or fibromyalgia, but from either standpoint, the prescribed pain medications, along with her current mental health treatment, were the appropriate interventions. (Tr. 5733). Plaintiff was told to follow-up as needed, (id.), and she did not do so before her date last insured. Nothing about that treatment history–which the ALJ thoroughly detailed in the decision, (see Tr. 1029–32)–compelled the ALJ to find that Plaintiff would be incapable of a range of sedentary and unskilled work due to fibromyalgia during the relevant period. Indeed, Plaintiff's claim of "ample evidence in the record supporting [her] allegations" consists only of a survey of instances where she reported symptoms associated with fibromyalgia. (See Pl.'s Br. 5–7). While that evidence supports the ALJ's finding that Plaintiff had fibromyalgia that would meet the de minimis regulatory definition of "severe," it does not prove that she is "one of the minority" of

people with fibromyalgia who are disabled by it. See Sarchet v. Chater, 78 F.3d 305 (7th Cir. 1996) ("Some people may have a severe case of fibromyalgia as to be totally disabled from working ... but most do not and the question is whether [claimant] is one of the minority."). Plaintiff simply "ignores an important distinction between, on one hand, diagnosing fibromyalgia and finding it to be a severe impairment and, on the other, assessing a claimant's physical limitations due to the impairment." See Torres v. Comm'r of Soc. Sec., 490 F. App'x 748, 754 (6th Cir. 2012).

Additionally, unlike the claimant in Arakas, the record lacks any medical opinion corroborating Plaintiff's allegations about the severity and limiting effects of her fibromyalgia symptoms. To the contrary, the only medical experts who considered Plaintiff's fibromyalgia diagnosis found her capable of performing at least some level work activity on a sustained basis despite that impairment. Specifically, when assessing Plaintiff's mental functioning, Bonny Gregory, M.D., listed fibromyalgia as a severe impairment and concluded that she appeared capable of a range of unskilled work, (see Tr. 70–72). When assessing Plaintiff's physical functioning, E. Woods, M.S., M.D., considered fibromyalgia and concluded that she physically could sustain a range of light work. (Tr. 72–73). The ALJ gave some weight to these assessments, as the ALJ found that she was limited to sedentary work, instead of light work. (See Tr. 1038).

In sum, the ALJ cited appropriate reasons to discount Plaintiff's allegations about the severity and limiting effects of her fibromyalgia. Here, under the substantial evidence standard is not whether a factfinder could have assessed greater limitations than those found by the ALJ. Rather, "[i]f 'conflicting evidence allows reasonable minds to differ as to whether a claimant is

disabled,' [a reviewing court] defers to the [ALJ's] decision." Jackson v. Astrue, 467 F. App'x 214, 216 (4th Cir. 2012) (quoting Johnson, 434 F.3d at 653)).

**B. Substantial Evidence Supports the ALJ's Determination that Plaintiff's Allegations about Migraines Could Not Be Fully Credited During the Relevant Period.**

The ALJ cited two specific reasons, each supported by substantial evidence, for why Plaintiff, despite her migraine allegations, could perform a range of sedentary and unskilled work on a sustained basis during the relevant period. First, longitudinal evidence suggested that Plaintiff responded well to migraine treatment during that period. Second, evidence about Plaintiff's activities and her conflicting testimony belied her allegations of disabling migraines. Either of these, on their own, satisfy the substantial evidence standard.

**1. The ALJ Reasonably Found that the Longitudinal Medical Evidence Relevant to Plaintiff's Migraines Did Not Support Her Allegations.**

When specifically discounting the notion that Plaintiff's migraines occurred with such frequency and severity that she would be off task for a meaningful part of the workday, or miss work on a regular basis, the ALJ focused on longitudinal medical evidence showing that Plaintiff's migraines were being controlled by treatment between July 2010 and December 2015. (See Tr. 1039). That factual determination is supported by the record.

Seeing a neurologist, Sunil Mehta, M.D., while she was still working in March 2009, Plaintiff reported that she had daily migraines, but she said that her symptoms were something that she could "deal with" and "more of a nuisance." (Tr. 345–47). Dr. Mehta prescribed Topamax, and although Plaintiff still had migraines over the next year when taking that medication, her symptoms had improved. (See Tr. 336, 339). She next reported having

headaches every other day in March 2011, so Dr. Mehta added Lyrica for use as needed. (Tr. 335). That medication helped; her headaches were "improved much" by June 2011. (Tr. 334).

Thereafter, except for a temporary issue when she was without her medications in December 2014, (see Tr. 769), Plaintiff's medical records show a good response to treatment for her headaches. At follow-up visits in 2012 and 2013, Dr. Mehta observed that Plaintiff was "doing well" with her headaches and simply refilled her medications. (See Tr. 314–15, 322). Dr. Mehta also described Plaintiff's headaches as stable and "not intractable" (i.e., responsive to treatment) in March 2015, (Tr. 761–64), and she did not report any new migraines issues before her December 2015 date last insured. (See Tr. 739–42, 746–50 (late 2015 visits with Dr. Mehta's practice where no specific migraine complaints were noted)). Over a year after her date last insured, Plaintiff reported that her headaches had gotten worse,[1] but her condition after her date last insured is not relevant here. See Johnson, 434 F.3d at 655 (evidence showing a worsened condition after the date last insured "is not relevant to [a reviewing court's] inquiry").

Plaintiff cites an unpublished decision from another district court, Porterfield v. Saul, No. 3:22-cv-00319 (M.D.N.C. Aug. 6, 2019) (attached to Pl.'s Br.), but there the claimant told her doctors when seeking treatment that she had daily debilitating headaches that could last hours; although she once reported that Topomax helped, she said it was not helpful at other times; she tried injection treatments like sphenopalatine ganglion blocks but they were without benefit; and she was a candidate for Botox injections. Id. at *8–9. The ALJ's failure to meaningfully discuss that significant evidence in Porterfield was found to be error. Id.

---

[1] She reported worsening headaches in January 2017 (Tr. 832), and past that, she was advised to stop taking Topomax due to side effects in late 2017, which ultimately caused a further worsening of her condition. (Tr. 7951, 8058).

-13-

The evidence related to Plaintiff's migraines here is simply not the same as that in Porterfield. When Plaintiff described the nature of her migraines to her doctors in 2009, she said her symptoms were something that she could "deal with" and "more of a nuisance." (Tr. 345–47). And then later records during the relevant period showed a consistently good response to treatment when taking Topomax and using Lyrica as needed. (See Tr. 314–15, 322, 334, 761–764). As the ALJ explained when discounting Dr. Mehta's March 2020 medical opinion, (Tr. 6746–47), that evidence did not support a factual determination that Plaintiff would be materially off-task or need to miss work on a regular basis due to migraines. (See Tr. 1039).

Relatedly, although Plaintiff cites to Dr. Mehta's March 2020 medical opinion in passing, she does not challenge the ALJ's finding that the opinion deserved only little weight. (See Pl.'s Br. 9–10). See 20 C.F.R. § 404.1527. Indeed, Dr. Mehta described the nature of Plaintiff's headaches as of 2019, (see Tr. 6746), which is four years after her date last insured, and his suggestion that Plaintiff began to have disabling migraines around 2012, (see Tr. 6747), finds no support in his treatment records. To the contrary, the only time Plaintiff saw Dr. Mehta in 2012, he noted that she was "doing well" in terms of migraines and just refilled her medication. (See Tr. 314). The ALJ therefore had good reasons to give little weight to Dr. Mehta's medical opinion on Plaintiff's migraines. See Johnson, 434 F.3d at 655–56 (affirming where the ALJ gave little weight to a medical opinion that reflected the claimant's condition nearly a year after the date last insured and otherwise conflicted with contemporaneous treatment notes).

Plaintiff also asserts that migraines do not appear on objective diagnostic testing and claims error in the ALJ's "apparent reliance on normal objective evidence." (Pl.'s Br. 11–12) (citing Arakas and cases applying its holding to migraines). But the ALJ did not rely on "normal objective evidence" to discount Plaintiff's allegations about her migraines. The ALJ cited to

normal diagnostic testing of Plaintiff's brain when detailing the medical evidence generally, (see Tr. 1025), but that was otherwise relevant here given Plaintiff's reported seizure disorder. When specifically discounting allegations about the limiting effects of Plaintiff's migraines, the ALJ relied on the longitudinal medical evidence showing a good response to treatment during the relevant period. (See Tr. 1039). Relying on that type of medical evidence was not error. See Smith v. Kijakazi, No. 1:21-CV-200-MOC, 2022 WL 1445230, at *4 (W.D.N.C. May 6, 2022) (finding no error where the ALJ found the claimant capable of sustaining medium work based on evidence that Plaintiff's migraines were controlled and "stable on medication").

**2. The ALJ Reasonably Found that Conflicting Testimony and Evidence About Plaintiff's Activities Undercut Her Allegations about Her Migraines.**

Along with the medical evidence, the ALJ also cited conflicting testimony and evidence about Plaintiff's activities when discounting her allegations about disabling migraines. (See Tr. 1020, 1024). In terms of conflicting testimony, the ALJ explained that Plaintiff's description about the nature of her migraines during the relevant period shifted between her two disability hearings. (See Tr. 1024). At her first disability hearing, she claimed to have one hour-long migraine every single day that she would need to "sleep off," (see Tr. 1188–89), and then at the second hearing, she said that she had good and bad days, with two-hour headaches on the bad days, which happened several times a week. (See Tr. 1081).

Regardless, both descriptions were undercut by Plaintiff's testimony about why she stopped working. (See Tr. 1024). As the ALJ noted, Plaintiff testified that she stopped working because she said that her job was "running her" so she asked to be relocated, but because she was too good at her job, her employer refused. (Tr. 1180). She then only quit after giving her two-week notice. (Id.). She did not indicate that her migraines were a hindrance in her ability to stay

-15-

Case 3:22-cv-00174-MOC   Document 16   Filed 01/18/23   Page 15 of 17

on task or attend work regularly, (id.), which is fully consistent with her description of her headache symptoms in her treatment records, where she said they were something that she could "deal with" and "more of a nuisance." (Tr. 345–47).

In addition to the conflicting testimony, the ALJ also explained that the evidence regarding Plaintiff activities in her "function report, testimonies, and medical evidence show that prior to her date last insured status expiring she was capable of the residual functional capacity delineated below [a range of sedentary and unskilled work] for an eight-hour workday." (See Tr. 1020 with Tr. 1016–17 (summarizing the evidence regarding Plaintiff's activities)). Specific to migraines, the ALJ highlighted Plaintiff's reports that she would play video games—an activity involving significant exposure to light and sound—multiple times a day "to kill some time," without any mention of being hindered by migraines. (Tr. 1017, 1039, 1182; see also Tr. 223 ("Get on laptop, may play a game or two on [F]acebook")). In fact, contradicting her allegations about migraines at her disability hearings, Plaintiff did not mention migraines in her 2014 function report. (See Tr. 223–30, 1116).

In sum, substantial evidence supports the ALJ's finding that, despite her migraines, Plaintiff could sustain a range of sedentary and unskilled work. Again, the issue here under the substantial evidence standard is not whether a factfinder could have assessed greater limitations than those found by the ALJ. Rather, "[i]f 'conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled,' [a reviewing court] defers to the [ALJ's] decision." Jackson, 467 F. App'x at 216 (quoting Johnson, 434 F.3d at 653).

### VI. Conclusion

The Court has carefully reviewed the decision of the ALJ, the transcript of the proceedings, Plaintiff's motion and brief, the Commissioner's responsive pleading, and Plaintiff's

-16-

Case 3:22-cv-00174-MOC   Document 16   Filed 01/18/23   Page 16 of 17

assignments of error. Review of the entire record reveals that the decision of the ALJ is supported by substantial evidence. Finding that there was "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," <u>Richardson</u>, 402 U.S. at 401, Plaintiff's Motion for Summary Judgment will be denied, the Commissioner's Motion for Summary Judgment will be granted, and the decision of the Commissioner will be affirmed.

## ORDER

**IT IS, THEREFORE, ORDERED** that:

(1) The decision of the Commissioner, denying the relief sought by Plaintiff, is **AFFIRMED**;

(2) Plaintiff's Motion for Summary Judgment, (Doc. No. 11) is **DENIED**;

(3) The Commissioner's Motion for Summary Judgment, (Doc. No. 14) is **GRANTED**; and

(4) This action is **DISMISSED.**

Signed: January 18, 2023

Max O. Cogburn Jr
United States District Judge